UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF ADAM BROWN,

    Plaintiff,

v.                                                          Case No. 12-C-1202

SERGEANT TIMOTHY THOMAS, et al.,

    Defendants.

## DECISION AND ORDER

Plaintiff, the Estate of Adam Brown, brought this action under 42 U.S.C. § 1983 seeking damages against Brown County, along with Sergeant Timothy Thomas and Deputy Matthew Secor of the Brown County Sheriff's Department, for the fatal shooting of Adam Brown. The defendants have moved for summary judgment. For the reasons given below, the motion will be granted.

## I. BACKGROUND

On December 1, 2006, Brown County Sheriff's Department Sergeant Timothy Thomas obtained a warrant to search the residence of Adam Brown. Based on a burglary investigation he was conducting, Thomas believed a teenager named Stone Moreaux was staying with Brown. Moreaux had an open warrant for his arrest after absconding from a work-release program at Brown County Jail, and Thomas believed Moreaux had stolen a video game system and other property from an apartment in the Village of Howard. Prior to obtaining the warrant, Sergeant Thomas contacted the patrol division for assistance in executing it.

Patrol Sergeant Todd Delain, who was in charge of the search, decided to use the Drug Task Force in executing the search warrant. The Drug Task Force consisted of officers with training in the execution of search warrants and special weapons and tactics (SWAT). According to Thomas and Delain, the decision to use the DTF was made because they were uncertain whether the individuals at the residence would be cooperative and the DTF officers had extensive experience in conducting searches. Moreover, because the residence had multiple entrances and exits, a team of officers was required to cover them.

DTF officers are not used to assisting in the execution of all search warrants. When police have no reason to believe that there will be violence or an attempt to destroy evidence, Sergeant Thomas explained, the officer will simply knock on the door, wait for the occupants to answer, and then explain that they have a search warrant and would like to come in. (Aff. of Timothy M. Johnson, Ex. D., Dep. of Sgt. Thomas, 15:8-15, ECF No. 14-4 at 5.) When there is reason to think the occupants might be violent, Sergeant Thomas explained, "you take a different approach which is more commonly known to people who work in SWAT or DTF fields because they work with that more often." (*Id.* at 15:18-21.)

In this case, Sergeant Thomas explained that even though the crime he was investigating was a property crime, he "had word" that Brown and his girlfriend were always in trouble. In addition, Moreaux was an escapee from the jail where he had been serving time on a robbery or burglary, and the officers were concerned what his frame of mind would be in being taken back to jail. (*Id.* at 15:25-16:11.) These matters were discussed at a briefing held prior to the search. Based on the information available, Sergeant Delain concluded that the more low-key approach would not be appropriate. The decision was made to have several officers approach the door, knock and announce who they were and why they were there. If the occupants did not open the door after

2

approximately 15 seconds, they would breach the door with a ram and force entry. (*Id.*, Ex. C, Secor Dep. at 22, ECF No. 14-3 at 7.)

Prior to executing the search, Deputy Secor, who worked as an undercover officer for the DTF, and another deputy conducted surveillance of the property and were able to observe two males playing video games inside. At 6:20 p.m. five officers lined up outside the front door of the duplex. In front was Deputy Secor, who was dressed in street clothes but was wearing a badge around his neck. As an undercover drug investigator, Secor also wore a ponytail, sideburns and a goatee, so that he would fit in with the drug culture. The officer immediately behind him also had a badge around his neck and was wearing a DTF jacket that said POLICE and DTF on it. The other officers behind Secor were wearing standard police uniforms.

Secor knocked on the door and yelled "Police — Search Warrant." While waiting, they saw Brown come to the window, look out, and then retreat away from the door. Another man also moved away from the door. At that point an officer yelled "Compromise," which apparently operates as a signal that immediate entry should be made. The officers quickly broke the door open and entered yelling, "Police, search warrant, get down on the ground!" Moreaux and another individual who was there dropped to the ground. Adam Brown, however, fled the officers and ran up the stairs. Deputy Secor and another deputy followed Brown upstairs, yelling "Police, stop!" When they arrived at the top of the stairs, they saw Brown standing in a bedroom pointing a shotgun, which turned out to be unloaded, in their direction. Secor shot Brown with his automatic assault rifle, striking him four times. Brown was later pronounced dead at the hospital.

In addition to the shotgun he pointed at the officers who followed him up the stairs, Brown also kept a sawed-off shotgun under his mattress. Because of prior convictions, Brown's possession of each of these guns was illegal.

3

## II. ANALYSIS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055, 1060 (7th Cir. 2014). In considering the factual evidence, a court must construe all facts and reasonable inferences in the light most favorable to the plaintiff as the non-moving party. *Casna v. City of Loves Park,* 574 F.3d 420, 424 (7th Cir. 2009). Based on the undisputed facts in this case, the Estate concedes that its claim against Deputy Thomas fails and that he should be dismissed. As to its claims against Deputy Secor and the County, however, the Estate argues the case should proceed to trial.

**A. Fourth Amendment Claim Against Deputy Secor**

The nature and extent of force that may reasonably be used by officers depends on the specific circumstances of the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *United States v. Place,* 462 U.S. 696, 703 (1983)). The inquiry is an objective one, meaning that the subjective feelings or intent of the officers is not relevant. *Id.*

The Estate essentially concedes that at the moment he confronted Brown in the upstairs bedroom, Deputy Secor was justified in shooting him because Brown had leveled a deadly weapon

4

at the deputies: "Plaintiff does not dispute that at the moment of confronting Adam Brown with a shotgun in the upstairs bedroom, the officers may have been justified in using deadly force." (Pl.'s Br. in Opp. at 7.) *See Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994) (affirming summary judgment dismissing claim of excessive force by estate against officer who fatally shot deceased as he was about to strike him with a poker). Rather than focusing on the shooting, the Estate argues that the officers and the County should be liable because the unreasonable time and manner in which they chose to execute the search warrant created the very dangerous situation in which Brown was ultimately shot.

To support its argument, the Estate relies on *Estate of Starks v. Enyart,* 5 F.3d 230, 233 (7th Cir. 1993). In *Starks*, officers surrounded a stolen taxi cab in a parking lot. Like here, there was no suggestion of violence in the underlying theft. Starks, the thief, started to maneuver the taxi to allow himself an escape route, and when he stepped on the gas the officers opened fire and killed him to prevent his escape. Key to the analysis was a factual dispute as to whether one of the officers was in the path of the taxi or whether he deliberately jumped out in front of the car when it started accelerating. If the officer was already in the car's path, then the plaintiff conceded that the officers were justified in using deadly force to prevent the taxi from injuring the officer. But if the officer had stepped in front of the rapidly moving cab, leaving the subject no time to brake, then the officer "would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him." *Id.* at 234. That is, if the jury believed the plaintiff's story that the officer jumped in front of the moving car, it could find that the officer essentially forced the situation by placing Starks—involuntarily—in a position in which he now posed a deadly threat to the officer. If that were true, the officers cannot escape liability on the grounds that the shooting was a reasonable

5

exercise of force.  The point of *Starks* is that deadly force is allowed in order to *prevent* injury or death.  An officer cannot unreasonably *create* circumstances in which injury or death would occur and then claim to be "preventing" that injury by using deadly force.  As the court explained, "Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force."  *Id.*

The Estate argues here that the use of seven officers in a night-time raid to conduct a search for a stolen video game was patently unreasonable.  It contends that the manner in which the officers conducted the search caused Brown to believe his apartment was being broken into by a violent gang of unknown people, and thus the officers forced his hand and required him to turn a deadly weapon on them.  The Estate notes that the lead officer, Deputy Secor, was in street clothes and had a ponytail.  Although he had a badge hanging around his neck, we cannot know whether Brown actually saw the badge.  Brown had experienced some kind of break-in in the past, and thus may have been especially sensitive to that possibility.  By proceeding in the aggressive way they did, the Estate contends that the officers essentially created the need to shoot Brown by giving him little choice but to defend himself with deadly force.  In doing so, the Estate contends, they violated his rights under the Fourth Amendment.

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., Amend. IV.  As a general rule, this means that police who are executing a search warrant must first identify themselves, announce that they have a warrant, and allow a reasonable time for the occupants to open the door before they forcibly enter the premises.  *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).  There are several reasons for this rule.  First, is "the protection of human life

and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Hudson v. Michigan*, 547 U.S. 586, 594 (2006). The second reason is the protection of property: "The knock-and-announce rule gives individuals 'the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry.'" *Id.* (quoting *Richards v. Wisconsin*, 520 U.S. 385, 393, n.5 (1997)). A third reason for the rule is that it "protects those elements of privacy and dignity that can be destroyed by a sudden entrance." *Hudson*, 547 U.S. at 594. "The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed." *Richards*, 520 U.S. at 393, n.5.

The requirement that police give the occupants of a premises to be searched an opportunity to allow entry is not absolute, however. The rule may be dispensed with and forcible entry made when law enforcement officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Id.* at 394. Thus, where police executing a search warrant for readily disposable contraband such as drugs have reason to suspect that the occupants of the premises are likely to dispose of the drugs or that they intend to arm themselves, immediate, forcible entry is permissible. *United States v. Dumes*, 313 F.3d 372, 381 (7th Cir. 2002). Forcible entry is also reasonable when after identifying themselves as police officers and announcing they have a warrant, entry is refused. 2 LaFave, Wayne, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.8(c) (5th ed.); *see also United States v. Peterson*, 353 F.3d 1045, 1050 (9th Cir. 2003) ("When Edwards affirmatively refused to admit the police, the factors of futility, danger, and potential destruction of evidence

7

supported the officers' decision to enter immediately."). Moreover, the refusal need not be verbal. "Indeed it would be an unusual case coming before the courts where an occupant affirmatively 'refused admittance' or otherwise made his refusal known verbally after being given notice." *Masiello v. United States*, 317 F.2d 121, 122 (D.C. Cir. 1963).

Here, it is undisputed that after police knocked on the door to Brown's apartment, identified themselves as police officers and stated they had a warrant, one of the male occupants "looked out the window towards the officers and then moved away from the door as if to hide." (DPFOF ¶ 39, ECF No. 20.) "A second individual was also seen walking away from the door so that he was out of sight." (*Id.* ¶ 40.) Based on these undisputed facts, the defendants concluded entry had been refused. They therefore immediately and forcibly entered the residence in order to prevent the occupants from arming themselves. (Johnson Aff, Ex. B., Dep. of Brad Dernbach at 21:17-21, ECF No. 14-2.) The question presented is whether their conduct violated Browns rights under the Fourth Amendment and essentially caused his death.

The Estate first suggests that given the relatively small value of the property they were looking for, the time and manner in which the officers chose to execute that warrant was unreasonable. It is important to keep in mind, however, that while the property sought by the officers in the warrant may not have had significant value, the Estate concedes they were investigating a burglary, which is a felony under Wisconsin law. (DPFOF, ECF No. 20, ¶ 10.) They also had reason to believe that the suspect in the burglary, who was also on escape status from a sentence for a robbery, would be present. (*Id.* at ¶ 21.) These are not petty offenses.

The Estate also suggests that it was unreasonable to execute the warrant at night. This, too, is not true. Wisconsin has no law restricting searches to daylight hours, and the warrant contained

no such limitation. It is no doubt true that "searches conducted in the middle of the night . . . involve a greater intrusion than ordinary searches . . . ." *Gooding v. United States*, 416 U.S. 430, 464 (1974) (Marshall, J., dissenting). But 6:20 p.m. is the dinner hour, not the middle of the night, and while it may have been dark out at that time, this is not enough to make the search unreasonable. In Green Bay, the sun sets as early as 4:15 p.m. during the winter months, before many people are home from work, and it does not rise until well after 7 a.m. To hold that search warrants can only be executed during daylight hours would mean that they would often be executed when no one is home, thereby necessitating forcible entry more often than would otherwise be necessary. Especially where the premises to be searched is located in a city where most homes have outdoor lights and street lights are common, one would not expect that executing a search warrant in the early part of the evening would not cause unwarranted emotional distress or trauma. In addition, the officers knew from their surveillance that the occupants of the premises were up and about playing video games. The officers were also concerned that the property they were looking for could be easily moved if they delayed further. Under these circumstances, the decision to execute the warrant at 6:20 p.m. was not unreasonable.

Nor can it be said that the use of seven officers to execute the warrant was unreasonable. As Sergeant Thomas explained, the officers thought there would be at least three occupants of the apartment, including Moreaux who "was an escapee from jail serving time on a robbery – use of force charge." (DPFOF ¶ 21, ECF No. 20.) Because of Moreaux's history and escape status, the officers concluded he might not be inclined to cooperate and comply with their directives, and thus a less aggressive "knock and talk" approach would not be prudent. And considering the number of individuals inside the house and the need to cover other entrances and exits to the premises, the

9

officers concluded a team of officers would be used. Given the uncertainties inherent in executing a search warrant, their seemingly excessive caution was not unreasonable.

The Estate argues that Brown likely did not know the people at the door were police officers because Deputy Secor was an undercover officer wearing only a badge for identification. But even if we assume that Brown did not see Secor's badge, the other officers were either wearing standard police uniforms or jackets that said POLICE on them. In addition, Deputy Secor yelled "police – search warrant" prior to entering. The Estate concedes that the officers yelled this and that they then began counting out-loud: one-thousand, one-thousand-one, one-thousand-two, etc. (ECF No. 20 at ¶¶ 37-38.) The next-door neighbor heard the yelling and came out of her house to investigate. (*Id.* at ¶ 45.) Even the officers covering an exit on the other side of the house heard Secor announce "police – search warrant." (*Id.* at ¶ 44.) Very soon after, an individual looked out the window and then retreated within the house, at which time the officers yelled "compromise" and broke the door in. When they got inside, they yelled "Police search warrant, get down on the ground," and the other two occupants of the house complied, while Brown fled. (*Id.* at ¶ 46.)

As the Estate acknowledges, one of the reasons police officers forcibly enter immediately after entry is refused is to prevent the occupants from arming themselves, which is precisely what Brown proceeded to do. The Estate contends that Brown would not have acted as he did had the police proceeded to execute the warrant in a less aggressive manner. The fact that Brown continued up the stairs to arm himself even as he heard the officers behind him yell "Police, stop!," suggests otherwise. But even if Brown would have acted differently had police utilized less aggressive tactics, it does not follow that Deputy Secor and the County could be liable.

As noted above, officers attempting to execute a search warrant may forcibly enter a premises when entry is refused. LaFave, *supra*. And because an occupant will often say nothing to police, a refusal must frequently be inferred from his actions. *Id.*; *see also United States v. Gallegos*, 314 F.3d 456, 459 (10th Cir. 2002) ("It is by now well-established that an occupant of a home need not affirmatively refuse admittance to trigger the right of the police to enter by force . . . . On the contrary, the refusal may be constructive or reasonably inferred from the circumstances.") (internal quotations omitted). In *United States v. Stotts*, for example, the court held that the occupant's refusal to allow entry could be inferred from the fact that he turned and ran after the agent identified himself and said he had a search warrant. 176 F.3d 880, 883 (6th Cir. 1999). Likewise, in *McClure v. United States*, the court found that entry had been refused where law enforcement agents observed occupant turn and run after she saw them through a window and then heard "footsteps running in the wrong direction" when they arrived at the door. 332 F.2d 19, 21-22 (9th Cir. 1964), *cert. denied*, 380 U.S. 945 (1965); *see also United States v. Augello*, 368 F.2d 692, 694-695 (3rd Cir. 1966) ("When, after making their announcement, the officers saw the appellant's sister running away from the door and calling the name of the very person for whose arrest they possessed a warrant, they were justified in making an immediate entry."), *reversed on other grounds*, 390 U.S. 200 (1968); *United States v. Aldrete*, 414 F.2d 238, 239 (5th Cir. 1969) ("Searching officers demanded entry to the residence. Fifteen to 20 seconds elapsed, they could see two persons rushing to the rear of the house, then they broke in the door. The entry was not invalid."); *Stamps v. United States*, 436 F.2d 1059, 1060 (9th Cir. 1971) ("The arresting officers gave notice of their authority and purpose when they appeared at the house in which Stamps was arrested. Only after hearing a commotion within and footsteps sounding to the officers as if one

were running away from the door, did the officers break open the door and make their entry. . . . There having been adequate reason to believe that permission to enter had been denied, reasonable force to effect the entry was permissible.").

It is true that all but one of the searches in the foregoing cases were for drugs, which are readily disposable and are often associated with guns. It is also true that the defendants here have offered no evidence that either Moreaux or Brown were keeping firearms at Brown's residence. The rule allowing force when entry is refused, however, is not limited to drug cases, and as this case shows, the risk that an occupant may attempt to arm himself is not limited to drug cases. In light of the authority cited above, the conduct of the officers here cannot be held to have been in clear violation of Brown's Fourth Amendment rights. At the very least, Deputy Secor would be entitled to good faith immunity since it was reasonable for him to believe his forcible entry, along with the other officers, did not violate clearly established law. *See Hinnen v. Kelly*, 992 F.2d 140, 142 (7th Cir. 1993) ("Government officers performing discretionary functions are shielded from civil liability unless their actions violate clearly established statutory or constitutional rights of which a reasonable officer would have known.") (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It follows that if Deputy Secor did not act unreasonably in entering Brown's residence, then he cannot be liable for responding as he did when Brown pointed a shotgun at him.

For these reasons, *Starks* does not apply. Whereas *Starks* involved a factual dispute about whether an officer had unreasonably placed himself in a position where he had no choice but to shoot a fleeing citizen, here the facts are undisputed and the claim that Deputy Secor created the need to shoot Brown by acting unreasonably finds no support in the law. In *Starks,* the officer's actions allegedly made Starks a deadly threat *despite* Starks' attempt to flee the scene nonviolently.

By jumping in front of the car (if that's what he did), the officer essentially created the very situation that ostensibly required the use of deadly force. But here, the officers were justified in forcibly entering the residence when entry was denied, or were at least acting in good faith in believing they were justified. No one forced Brown to flee and then point a gun at Deputy Secor. He could have surrendered at the door or, at a minimum, tried to escape. Instead, he ran to a room containing weapons and then drew a gun on someone he knew or should have known to be a police officer. *Starks* does not say that officers who use aggressive police tactics cannot use deadly force if it becomes necessary. It merely says that police cannot escape liability if their actions turn a nonviolent fleeing suspect into a violent threat to life and limb. That is not what happened here.

The Estate also relies on *Deering v. Reich*, where officers executed an arrest warrant in the middle of the night with similarly disastrous results. 183 F.3d 645 (7th Cir. 1999). Deering, whom the court described as an "elderly" sixty-nine-year-old man with mental problems, lived alone on a farm in the country. After backing his car into a motorcycle, he had failed to appear in court for his misdemeanor case. Deputy sheriffs snuck up on his house and, through a window, observed Deering sleeping. When they announced themselves, Deering awoke and grabbed a shotgun. Commotion ensued. Deering went into the yard with his gun and fired a shot. The deputies scattered, and one of them believed Deering was pointing the shotgun at him. The deputy then fired eleven rounds at Deering, killing him. *Id.* at 648-49. The case proceeded to trial, and the jury found in favor of the officers. The Estate argues that in this case, as in *Deering*, "the jury should be permitted to evaluate the totality of the circumstances and determine whether Deputy Secor and the Brown County officers used appropriate force for those circumstances." (Pl.'s Br., ECF No. 18 at 8.)

13

This case differs from *Deering*, however, in that in this case there is no doubt that Deputy Secor was justified in shooting Brown when Brown pointed a shotgun at him and his fellow officer. In *Deering* that was not the case. Deering had fired a shot, it is true, and the court thus recognized that "it is hard to imagine that any prior circumstances would cause the jury to fail to focus on the fact that Deering fired at the deputies." *Id.* at 652. Even so, the *Deering* court recognized that the other circumstances *could* have been relevant. What Deputy Reich knew was limited: it was dark out, the subject was old, and the situation was chaotic. "Deputy Reich could not see Deering but, hearing the commotion, he moved forward and drew a bead on Deering." *Id.* at 648. He "thought" Deering was facing him, holding a shotgun at his shoulder. *Id.* But this was after Reich himself advanced on Deering after taking shelter in a shed. In short, there was enough uncertainty and flux in the situation that a jury could conceivably have considered circumstances other than the fact that Deering had fired at an officer. Perhaps the officers could have found shelter and negotiated with Deering. Maybe they could have retreated, or perhaps disarmed the elderly man in some way other than by firing eleven shots at him. The point is that in *Deering* the need for the officer to shoot Deering was not a given. Nevertheless, the jury found in favor of the officer, and the Seventh Circuit affirmed, finding that the jury knew enough about all of these factors to entitle it to render a judgment on the proper use of force.

In sharp contrast to *Deering,* here there are no other circumstances that would be relevant to an analysis of the shooting: Deputy Secor was justified in shooting Brown because Brown pointed a shotgun at him. None of the other circumstances would trump that fact, which explains why the Estate has conceded that the shooting was justified. Simply put, in this case the fact that Brown was pointing a gun at him *was* the totality of the circumstances, as far as the use of force was

14

concerned. All that was left here was the manner in which the warrant was executed which, for the reasons set forth above, was reasonable and does not give rise to individual liability on the part of Deputy Secor. Summary judgment will therefore be granted on the claim against him.

**B. *Monell* Claim Against Brown County**

Finally, the Estate argues that it has alleged a proper *Monell* claim against Brown County. Under *Monell v. Department of Social Services,* 436 U.S. 658 (1978), a government entity may be held liable if a constitutional violation arises from an official policy or custom. The Estate argues that the procedure used here was cleared by policymakers (sergeants), who also considered (but rejected) less intrusive means of executing the warrant. Whether the decision to use the DTF to conduct the search in the manner which led to Brown's death is viewed as the result of the County's policy or the absence of a policy, the Estate contends that the County is liable.

"[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield, Ill.,* 630 F.3d 499, 504 (7th Cir. 2010) (citation omitted). Thus, if the actions of Deputy Secor and the other officers involved in the search did not violate Brown's constitutional rights, the County cannot be liable in any event. If, on the other hand, those who carried out the search are merely immune from liability because they acted in good faith, the County could be liable for any violation that resulted from its unconstitutional policy or custom. *See Owen v. City of Independence*, 445 U.S. 622, 650 (1980) (rejecting claim that municipalities should be afforded qualified immunity like that afforded individual officials based on the good faith of their agents). Even if a constitutional violation is shown, however, the County cannot be liable under § 1983 unless the constitutional violation was caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice;

or (3) a decision by a municipal agent with "final policymaking authority." *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011).

Here, the Estate has failed to identify any express County policy or widespread custom or practice that has given rise to frequent constitutional violations. Sergeant Thomas explained that, in general, an investigator with a warrant will simply knock on the door and wait for the occupant to answer when there is no reason to worry about violence, the destruction of evidence or flight. Where there is a concern that the target of the search might not cooperate, the investigator contacts the patrol division for assistance. The Estate notes that the officers in this case discussed using a more low-key approach, but concluded that the fact that Moreaux was an escapee and a suspect in a burglary with a previous record for a violent felony warranted a more cautious approach. While one may disagree with the conclusion that Moreaux, no matter how one characterizes his crimes, really posed a threat sufficient to warrant a team of officers trained in special weapons and tactics, the Estate has not pointed to any County policy or custom that required the use of the DTF to conduct the search. Nor has it presented any evidence of similar incidents occurring in the past. Instead, the evidence indicates that the decision to use the DTF was made by Sergeant Delain. The Estate offers no evidence that Sergeant Delain, or anyone else involved with the search, had final policy making authority for the County or even for the Sheriffs Department. Based on the record before the court, there is therefore no basis on which the County could be found liable under *Monell* even if a violation of Brown's constitutional rights could be shown. Summary judgment will therefore be granted on the Estate's claim against the County as well.

## III. CONCLUSION

This case is tragic, and the Estate's indignation is to some extent understandable. One cannot help but wonder whether this sad sequence of events could have been avoided if Sergeant Thomas had simply knocked on Brown's door, waited for him to answer it, and then calmly explained that he had a warrant to search his house for a video game Moreaux was suspected of stealing. In simpler times, this most likely would have been the approach. Unfortunately, those times appear to have passed. Today, partly in response to the "war on drugs" and the proliferation of guns, especially assault weapons, but perhaps due more to federal funding and incentives, law enforcement agencies across the country have established SWAT Teams that use military-style tactics to execute search warrants in certain cases, particularly those involving drugs or guns. *See, generally,* Balko, Radley, OVERKILL: THE RISE OF PARAMILITARY POLICE RAIDS IN AMERICA (Cato Institute White Paper 2006) available at http://object.cato.org/sites/cato.org/files/pubs/pdf/balko_whitepaper_2006.pdf. SWAT Teams specialize in making what are called "dynamic entries" that involve using an extraordinary and overwhelming show of force in order to deal with difficult and dangerous situations. *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001). The theory underlying the tactic is that by entering a home quickly and with overwhelming force, law enforcement can discourage or prevent any attempt by the occupants to arm themselves or destroy evidence. Though intended to insure safety for both the officers and the occupants, substantial evidence suggests that the tactic may be overused and too often results in tragedy. *See* OVERKILL, *supra*, Appendix of Case Studies. The use of such tactics has the potential of turning officer fears into self-fulfilling prophecies.

On the other hand, this case can also be seen as support for the view that such tactics should be employed even in cases that on the surface, seem relatively minor. Here, for example, though police thought they were looking for a stolen video game and a walk-away from jail, Brown was unlawfully in possession of two firearms. (DPFOF ¶ 62, ECF No. 20.) Perhaps if Sgt. Thomas had not sought the assistance of the Drug Task Force to execute the warrant, it would have been his life that was lost. We will never know.

Regardless of whether it was necessary to call out the Drug Task Force to execute the search warrant in this case, however, the undisputed facts indicate that the individual defendants here did not act in violation of Brown's constitutional rights in executing the search warrant on his house. At the very least, they acted in good faith. The Estate has also failed to demonstrate any basis on which the County could be liable. Accordingly, the defendants' motion for summary judgment is granted. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this __17th__ day of March, 2014.

s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court